## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

WILLIAM WEST,

               Plaintiff,

    vs.

ACCESS CONTROL RELATED
ENTERPRISES, LLC; LLR EQUITY
PARTNERS, IV, L.P.; LLR EQUITY
PARTNERS PARALLEL IV, L.P.;
SETH LEHR, an individual;
DAVID STIENES, an individual;
GREG CASE, an individual;
ROBERT CHEFITZ, an individual; and
JOSEPH GRILLO, an individual;

               Defendants.

C.A. No. _____

**JURY TRIAL DEMANDED**

## COMPLAINT

Plaintiff William West ("West"), by and through his undersigned counsel, brings this action against Defendants Access Control Related Enterprises, LLC, LLR Equity Partners, IV, L.P., LLR Equity Partners Parallel IV, L.P., Seth Lehr, David Stienes, Gregory Case, Robert Chefitz and Joseph Grillo, and alleges as follows:

### I.

### NATURE OF THE ACTION

1.     In 2012, West co-founded Access Control Related Enterprises, LLC ("ACRE" or the "Company"). Under his strategic leadership as a co-founder, its Chief Financial Officer and its Chief Operating Officer, ACRE quickly succeeded and grew into a leading private security company through acquisitions of companies such as Ingersoll Rand carve-out Schlage Management Systems, Mercury Security Corporation, and the Siemens Security Products Group.

The essence of ACRE's business plan and the reason for its explosive success was simple: growth through strategic acquisitions of private security firms domestically and internationally.

2.      ACRE's success was quickly noticed by the market and, specifically, by private equity firm LLR Equity Partners ("LLR"). Soon thereafter, in 2013, LLR made a substantial investment in the Company, giving LLR a majority ownership interest and control of ACRE's Board of Directors. LLR became ACRE's anchor investor, representing to commercial banks that ACRE had an equity partner interested in funding a long series of growth acquisitions.

3.      But despite its supposed commitment to the long-term growth potential of ACRE, LLR soon became focused on cashing out its investment. Facing underperforming investments in the rest of its portfolio, LLR sought to shore up its short-term returns through ACRE's cash flow.

4.      To this end, LLR began to push management to create exit options. At a meeting in September 2015, LLR instructed ACRE's management to consider four potential "exit strategies" for LLR.

5.      One of those strategies was for ACRE management to purchase LLR's interest through a management buyout ("MBO") of ACRE subsidiary Mercury Security Products LLC ("Mercury"). Another was a dividend recapitalization, whereby ACRE would take on significant debt in order to pay its shareholders (primarily LLR) a special "dividend."

6.      West immediately knew that the dividend recapitalization option would harm ACRE. It would shut down ACRE's expansion potential by depleting funds needed for strategic acquisitions and position LLR to appreciably dilute all other shareholders' equity. By saddling ACRE with the maximum debt LLR could extract from the financial markets, LLR's refinancing would primarily benefit LLR and its investors by allowing them to cash out a portion of their

investment in ACRE at the expense of continued growth.  It was also predicated on uncertain growth projections which understated the impact of the debt on ACRE's ability to continue its acquisitive growth strategy.  As described by Fortune magazine, dividend recapitalizations of the sort promoted by LLR at ACRE are a "noxious financial strategy" that give "quick and easy money" to private equity owners but are "bad for business in the long term."

7.      Amplifying concerns with this strategy was the continuing realization by West and his partner Steve Wagner that LLR's short-term financial interests were unduly influencing its decision making.  Indeed, as had been reported by CEO Joseph Grillo, LLR was "interested in an early exit due to the weak financial performance of their current fund."

8.      To ensure that the interests of ACRE and all of its shareholders were considered, West and Wagner sought to encourage discussion on an MBO – which would not have the negative effects of a dividend recapitalization.  They contacted M&A Capital, the company that had handled LLR's investment in ACRE in 2013, to selectively approach potential financial partners best suited for an MBO.  West and Wagner ensured strict confidentiality in the process, requiring all lenders to sign a non-disclosure agreement (NDA) before receiving any information about ACRE.  There was significant lender response and interest in financing an MBO, given the extraordinary success of ACRE's historic performance executing its roll-up strategy, and given the vast opportunity to continue that successful strategy under the existing management team if given access to additional capital.

9.      In the meantime, LLR formed an alliance with Grillo to facilitate its exit plans.  In October 2015, LLR awarded Grillo a substantial salary and bonus increase and instructed Grillo to "manage" West and Wagner.  LLR and Grillo also proposed in early November that starting in 2016 West would be replaced as ACRE's CFO and remain the CFO/COO of Mercury only.

Wagner questioned the motive behind this "illogical" plan and asked Grillo "What's not being said here?"

10.     During an ACRE Board meeting in November 2015, West proposed repaying some outstanding bank debt with excess cash on hand.  The effect would have been to lower the overall interest payments due to the banks by returning some of their capital.  LLR argued that instead ACRE should dividend cash out to shareholders, especially LLR– again confirming its focus on its own short-term interests.

11.     During the same November 2015 Board meeting, Wagner reported his opposition to a dividend recapitalization, arguing that it would unfairly strap the business – specifically Mercury Security – with excessive debt while passing proceeds to select shareholders.  LLR followed up this discussion by making a private proposal to Wagner that would have entailed other shareholders extending loans to Wagner in order to buy his cooperation.

12.     In December 2015, West and Wagner then reported to LLR the positive lender interest that existed for an MBO.  But rather than consider this alternative for ACRE, Seth Lehr, a LLR partner and LLR-designated Board member, told West that he was suspended immediately.  Grillo sent a letter to West that same day stating that West was being placed on a leave of absence "effective immediately."  Lehr also threatened that LLR "has a deep war chest to litigate issues like this."

13.     On December 13, 2015, West sent a letter to the ACRE Board explaining that he intended to submit to the Board the details of the proposal supported by ACRE's minority shareholders.  West wrote that the MBO "would allow investors to lock in an attractive price and substantial investment returns now, as much as two years before a transaction might otherwise be achieved" under the alternative dividend recapitalization or a full exit from ACRE.  West noted

that "[t]he Board, of course, has the responsibility to fully and fairly assess this alternative, which I believe will optimize shareholder value and give the company the best chance of succeeding." Minority shareholders of ACRE supported the proposal.

14.     On December 15, 2015, Lehr and Stienes directed LLR's outside counsel to send a letter to West, threatening to terminate West and to pursue a potential civil action against him for continuing to pursue the MBO. That same day, one of LLR's designees on the ACRE Board, Robert Chefitz circulated an email advocating that ACRE and all of its Board members and investors implement "security measures" against West, including that "people in our office be aware of what Will West looks like and be prepared to warn you and deny access."

15.     On December 17, 2015, West circulated the MBO proposal to the ACRE Board. That same day, without considering the MBO proposal, the LLR-controlled Board voted to immediately terminate West's employment. Once he was removed from his operating position, he was subsequently removed from the ACRE Board on January 7, 2016. The LLR-controlled Board labeled its' termination of West "for cause," and purported to strip West of more than $15 million worth of his common units of ACRE equity, and to refuse to pay West executive compensation owed him.

16.     LLR's actions were a transparent attempt to silence West. By doing so LLR could quell consideration of an option that conflicted with its short-term and self-serving financial interests. And in terminating West, LLR could discredit and stifle opposition from a respected co-founder and officer that would have forced the Board to consider ACRE's long term interests and those of its minority shareholders.

17.     More specifically, LLR ignored the MBO option because it would have (i) terminated LLR' right to continue to receive substantial management fees, which had become

critical to LLR because of the failure of LLR's other investments; (ii) required LLR to immediately pay out its limited partner investors, which would have resulted in little or no profits to LLR due to a loss of carry on its investment; and (iii) required LLR to abandon the dividend recapitalization scheme and to withdraw from one of its key portfolio investments, which also served as the anchor investment in LLR's otherwise spotty attempts to build a security industry sector practice.

18.     The consequence of LLR's actions was the destruction of the management team that had led ACRE to success, including direct personal damage to ACRE's co-founder, West, and his ACRE shares.   By virtue of his termination, West has already been stripped of $15,000,000 of equity in ACRE.   And by virtue of defendants' continuing abdication of its fiduciary duties, he (along with the other minority shareholders) have lost hundreds of millions more.

19.     The conspiracy that furthered LLR's personal financial interests and that culminated in West's "termination" was coordinated by Joseph Grillo and a coterie of LLR sycophants installed to exercise unfettered LLR control over ACRE, to LLR's short-term benefit and to the detriment of ACRE and to the detriment, undisclosed to them, of ACRE's intended new creditors.   West now brings this action against LLR and the private equity firm's collaborators at ACRE for breach of fiduciary duty and related claims seeking compensations for the harm he has suffered.

## II.

## PROCEDURAL HISTORY

20.     This complaint was originally filed in Los Angeles Superior Court on November 28, 2016.

21.     On May 2, 2017 the Honorable Judge Dalila Corral Lyons of the Los Angeles Superior Court, Department 20, entered an order granting Defendants' Motion to Dismiss or Stay Action for Forum Non Conveniens.  The court retained jurisdiction over the action and all the named parties but stayed the action in its entirety until the case is finally adjudicated by a court in Delaware, or until further order of the court.

## III.

## THE PARTIES

22.     Plaintiff William West is a citizen of the State of California, residing in Orange County, California.

23.     Defendant Access Control Related Enterprises, LLC ("ACRE" or the "Company") is a Delaware limited liability company.  ACRE's shareholders include West, Defendants LLR Equity Partners, Joseph Grillo and Greg Case, and non-parties Steven Wagner, Prudential Capital Partners IV, L.P., Prudential Capital Partners Management Fund IV, L.P., and PCP-IV Access Control Holding, L.P. (collectively, the "Prudential Funds"), Egis-Mercury Intermediary LLC ("Egis"), and Quicksilver Holdings, Inc. ("Quicksilver").

24.     Defendants LLR Equity Partners, IV, L.P. and LLR Equity Partners Parallel IV, L.P. (collectively, "LLR" or "LLR Equity Partners") are each Delaware limited partnerships and private equity funds which, on information and belief, maintain offices in Philadelphia, Pennsylvania.

25.     Defendant Seth Lehr ("Lehr") is the founding partner of LLR and chairman of the ACRE Board. On information and belief, Lehr resides in Philadelphia, Pennsylvania.

26.     Defendant David Stienes ("Stienes") is a partner of LLR and member of the ACRE Board. On information and belief, Stienes resides in Philadelphia, Pennsylvania.

27.    Defendant Gregory Case ("Case") is a former partner of LLR and one of the four "LLR Partners Designees" on the ACRE Board.  On information and belief, Case resides in Philadelphia, Pennsylvania.

28.    Defendant Robert Chefitz ("Chefitz") is a general partner at Egis Capital Partners and one of the four "LLR Partners Designees" on the ACRE Board.  On information and belief, Chefitz resides in New York, New York.

29.    Defendant Joseph Grillo ("Grillo") is the Chief Executive Officer of ACRE and a member of the ACRE Board.  On information and belief, Grillo resides in New London, Connecticut.

## IV.

### JURISDICTION AND VENUE

30.    Subject matter jurisdiction is proper in this Court under 28 U.S.C. § 1332 because complete diversity of citizenship exists among the parties, and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

31.    This Court has personal jurisdiction over all Defendants because they each are either organized under Delaware law or transact business in this state.  Furthermore, the Second Amended and Restated Limited Liability Company Agreement provides that "any legal action or proceeding with respect to this Agreement … shall be brought exclusively in the Chancery Court of New Castle County, Delaware or the courts of the United States of America for the District of Delaware."  Further, the Securityholders' Agreement states that the parties "agree that any suit … based on any matter arising out of or in connection with, this Agreement … shall be brought in the United States District Court for the District of Delaware or in the Chancery Courts of the State of Delaware, … and each of the parties hereby irrevocably consents to the exclusive

jurisdiction of such courts ….."

## V.

## FACTUAL BACKGROUND

**A.    West Co-Founds and Grows ACRE Into a Premiere Security Technology Firm.**

32.    In early 2012, West co-founded ACRE with Grillo.   ACRE provides security technologies to limit physical access to campuses, buildings, rooms, or other environments.   It develops and manufactures authorization, authentication, and access control panels and software.

33.    Through strategic roll-up acquisitions and consolidation, West planned to build a dominant security technology firm that would provide innovative products for the electronic security systems market, with a focus on access control.   West's background in mergers and acquisitions, particularly in the access control industry, made him particularly suited to lead ACRE in this strategy.

34.    On or about August 31, 2012, ACRE secured its first acquisition, a carve-out from Ingersoll Rand named Schlage Management Systems ("SMS").   SMS was reorganized as a wholly-owned subsidiary of ACRE.

35.    ACRE's next acquisition target was Mercury Security Corporation ("Mercury"). In 2012, Mercury was the largest independent provider of access controllers in the United States, and its technology powered approximately 20% of all access panels sold annually.   Mercury, headquartered in Long Beach, California, was widely recognized as the market leader by security systems manufacturers, security consultants, and end users.   Mercury also had among the most diverse and robust set of security technology features in the marketplace.   West spent over 14 months between 2012 and 2013 leading ACRE's acquisition of Mercury and spearheaded the financing of the transaction, which closed on June 3, 2013.

36.     By June 2015, under West's financial leadership ACRE had already become the leading player at the first stage of the value chain, and the number five player globally at the second stage of the value chain.

**B.     LLR Equity Partners invests in ACRE.**

37.     In December 2012, LLR Equity Partners approached M&A Capital about becoming possible investors in ACRE.  LLR Equity Partners had learned of ACRE from contacts at Prudential Capital Partners IV, L.P., which had agreed to supply the debt-financing on the Mercury acquisition.  Impressed by the backgrounds of West and Grillo and the financial value of the roll-up acquisition strategy, LLR Equity Partners entered into an agreement with West and Grillo to become ACRE's biggest investor.

38.     On or about June 3, 2013, in conjunction with ACRE's acquisition of Mercury, LLR Equity Partners, West, Grillo, the Prudential Funds, and Egis entered into a Securities Purchase Agreement.  Pursuant to that agreement, West and Grillo sold a portion of their equity interest to LLR Equity Partners, and were each issued 16,500 preferred units and 654.55 common units.  LLR Equity Partners acquired a total of 460,350 preferred units and 4,650 common units, making it ACRE's largest shareholder.  Steve Wagner also joined as an equity owner and was issued 16,500 preferred units and 654.55 common units.

39.     The newly-constituted ACRE Board appointed Wagner President of Mercury, and appointed West CFO and COO of both Mercury and ACRE.

**C.     West leads ACRE's financing and acquisition of Siemens.**

40.     In 2014, following nearly two years of negotiations, West led ACRE's acquisition of Siemens Security Products ("Siemens"), part of the Siemens' Building Technologies Division.  ACRE renamed the business "Vanderbilt International."  ACRE signed the deal for the Siemens

acquisition on October 21, 2014, and the deal closed on June 1, 2015.   Concurrently, and independent of Board involvement, West executed a commercial debt refinance of ACRE, raising an eighty million dollar ($80,000,000) credit facility which retired high-cost mezzanine debt, created cash for the Siemens acquisition, and left substantial working capital to maintain operations and further grow the business.

41.     The Siemens acquisition represented a coup for ACRE.  It significantly boosted Vanderbilt's market position in the European security systems market and expanded Vanderbilt's presence in the security industry generally.  The acquisition also transformed Vanderbilt from a mid-sized player in the United States, to the number five player globally.

**D.     LLR Partners Lehr and Stienes Direct West to Pursue a "Management Buyout" as an Exit Strategy for LLR's Investment in ACRE.**

42.     In late 2015, following the Siemens' acquisition, LLR Equity Partners, through ACRE Board members Lehr and Stienes, began exploring ways of liquidating LLR Equity Partners' investment in ACRE.

43.     On or about September 29, 2015, Lehr and Stienes met with West, Wagner, and Grillo in Anaheim, California to discuss potential "exit scenarios" for LLR Equity Partners in a formal written presentation titled "ACRE Growth Strategy & Exit Planning."  The September 2015 presentation confirmed that "LLR Equity Partners is pleased with performance of the investment, supportive of management and heavily invested and active in the sector."  The presentation also noted that LLR Equity Partners was at a "cross-roads" and needed "to determine priority of investments and resources while aligning exit/liquidity desires of investors and management team."

44.     The September 2015 presentation included four possible exit "scenarios" by which LLR Equity Partners might liquidate its investment in ACRE, including a "management

buyout" or "MBO" whereby ACRE management would assume control of Mercury by rolling a portion of their equity into Mercury and separating it from Vanderbilt Industries. The presentation also suggested a debt-based or dividend recapitalization of ACRE, whereby "[e]xisting debt is refinanced and all remaining proceeds along with excess cash is distributed to shareholders as a dividend."

45.     The September 2015 Anaheim meeting was not the first time ACRE management had discussed a potential management buyout with LLR Equity Partners. Both West and Wagner had previously informed Lehr and Stienes on several occasions of their interest in regaining ownership control of ACRE through an MBO following LLR Equity Partners' liquidation of its investment.

46.     No decision was reached at the Anaheim meeting as to which "exit strategy" would be adopted, but Lehr and Stienes made clear in the presentation and at the meeting that one of the "key questions" to be answered by management, *i.e.* West, Wagner and Grillo, was whether it was "viable for management to complete an MBO of the ACRE investor base."

**E.     LLR Equity Partners Form an Alliance with Grillo.**

47.     In early October 2015, during a call to discuss LLR's proposed exit strategies, Grillo unexpectedly announced that LLR had awarded him a substantial salary and bonus increase and that Lehr and Stienes wanted Grillo to begin to "manage" West and Wagner – his equal partners.

48.     In early November 2015, LLR sent an email to West, Wagner and Grillo proposing that going forward, Grillo would remain CEO of ACRE, but that West would be replaced as ACRE's CFO and remain the CFO/COO of Mercury only. Grillo echoed this proposal, and informed West and Wagner that LLR already had suggested a possible ACRE

CFO replacement and that Grillo was "actively engaged in a discussion with an external candidate." Wagner questioned LLR and Grillo's motives, stating that hiring a replacement CFO for ACRE was "illogical" because the position was, according to Stienes and LLR, "not a full time job" that West could also perform, and asking "What's not being said here?"

**F.    West and Wagner Secure Financing for an MBO, While LLR Equity Partners' Dividend Recapitalization Efforts Fail.**

49.    Following the September 29, 2015, meeting in Anaheim, California with Lehr and Stienes, West and Wagner pursued LLR Equity Partners' directives to begin exploring MBO financing, and in mid-October met with their established representative at M&A Capital – the company that had handled LLR Equity Partners' investment in ACRE in 2013 – to discuss whether an MBO was a realistic exit strategy.

50.    In early November, 2015, Lehr and Stienes reiterated LLR Equity Partners' interest in pursuing a potential MBO offer.  On or about November 5, 2015, in advance of a three-day ACRE Board meeting in Europe, Stienes distributed the September 2015 presentation outlining LLR Equity Partners' four proposed "exit scenarios" to the ACRE Board.  Given the uncertainty about how the financial markets would receive any of the proposed scenarios, none of the options could be guaranteed at the time of the November Board meeting.

51.    Following the November Board meeting, West, as the Company's Chief Financial Officer, in collaboration with Wagner and representatives of M&A Capital, and pursuant to non-disclosure agreements, spoke with financial institutions about the viability of an ACRE management buyout.  They received significant interest in funding the transaction.

52.    During this same period, LLR Equity Partners spoke with lenders about the dividend recapitalization.  In contrast to the successful MBO inquiries, LLR Equity Partners' dividend recapitalization efforts were a failure.  In a December 7, 2015 email, one of LLR Equity

Partners' analysts, Michael Levenberg, informed West that LLR Equity Partners' efforts had not been well received.

**G.    West Submits a Favorable MBO Offer to the ACRE Board and is Wrongly Terminated "For Cause."**

53.    On December 7, 2015, Wagner met with Lehr to explain that he and West were prepared to present a MBO proposal to the ACRE Board, for which they likely had funding. Lehr, without even asking what price was being proposed, claimed that the MBO was "not authorized" and told Wagner to "shut it down."

54.    Three days later, in a meeting on December 10, 2015, Lehr informed West that he was suspended.  That same day, Grillo sent a letter to West stating that he was being placed on a "leave of absence" effectively immediately.

55.    On December 13, 2015, West sent a letter to the ACRE Board stating that he planned to submit a written MBO proposal supported by minority shareholders by the end of the week.  West explained that the proposed MBO "would allow investors to lock in an attractive price and substantial investment returns now, as much as two years before a transaction [*i.e.*, sale of Mercury] might otherwise be achieved."  West also noted that the MBO would "allow those who continue as shareholders of ACRE to focus on developing and harvesting the Vanderbilt platform with zero cost basis and tremendous upside" and pointed out the ACRE Board had "the responsibility to fully and fairly assess this alternative" which would "optimize shareholder value and give the company the best chance of succeeding."

56.    On December 15, 2015, Lehr and Stienes directed LLR's outside counsel to send a letter to West, threatening to terminate West and to pursue a potential civil action against him for pursing the MBO.

57.    On December 16, 2015, West's counsel sent a letter to LLR's counsel and to the

14

ACRE Board, informing them that West emphatically rejected any claims of misconduct and that each member of the ACRE Board had an independent fiduciary duty to fully and fairly consider the forthcoming MBO proposal.

58.     On December 17, 2015, West submitted the written MBO proposal to the ACRE Board. That same day, the Board – without even considering the proposal or whether it was in the best interests of the company and its shareholders – voted to terminate West. The purported justification was that West had not been authorized to explore the market for an MBO and that West had purportedly violated his employment agreement by sharing ACRE financial information with prospective lenders. Both assertions were preposterous: West was fulfilling his obligations as Chief Financial Officer to present options that could maximize shareholder value to his Board.

59.     LLR also directed ACRE's Board to seize 488 of West's common units of ACRE equity, worth more than $15 million, and refused to pay West substantial compensation due and owing to him.

60.     On January 26, 2016, West's counsel received a letter from ACRE's counsel informing West that the Board had elected "not to entertain" West's December 17, 2015, MBO proposal, and instead intended to pursue a dividend recapitalization of ACRE.

61.     The dividend recapitalization still has not occurred and, on information and belief, ACRE's Board has not received any proposals that would create greater investor return for ACRE shareholders or new lenders than what was presented in West's December 17, 2015 proposal.

## FIRST CAUSE OF ACTION

**(BREACH OF FIDUCIARY DUTY- Against Defendants LLR Equity Partners, Seth Lehr, David Stienes, Greg Case, Robert Chefitz, and Joseph Grillo )**

62.     West incorporates by reference Paragraphs 1 through 61 of this Complaint.

63.     At all times pertinent Defendants Lehr, Stienes, Case, Chefitz and Grillo were members of the Board of Directors of ACRE, and Defendant LLR Equity Partners was the controlling shareholder of ACRE.  Defendants Lehr, Stienes, Case, and Chefitz served as LLR Equity Partners' four "Designees" on the seven person Board, and Defendant Lehr also served as chairman of the Board.

64.     As directors of the ACRE Board, Defendants Lehr, Stienes, Case, Chefitz and Grillo each owed fiduciary duties to ACRE and its shareholders to act with good faith in the best interests of the Company and its shareholders, which included West.  LLR Equity Partners, as the controlling shareholder of ACRE, also owed these fiduciary duties to the Company and its minority shareholders.

65.     Defendants acted improperly, and not as reasonably careful directors of the Board and majority shareholders should have, including by:  (i) taking action to silence West and to prevent fair consideration of his management buyout proposal; (ii) pursuing their own self-interest in a dividend recapitalization to the detriment of the Company and its shareholders; and (iii) wrongfully terminating West in violation of his employment agreement and to the detriment of the Company and its shareholders.  Each of these failures is a breach of these Defendants' fiduciary duties.

66.     West was harmed as a direct result of this wrongful conduct and these breaches of fiduciary duty, each of which was a substantial factor in causing West's harm, in amounts to be

proven at trial.

67.     Defendants' conduct was willful, malicious, and oppressive, and done in conscious disregard of West's rights, and merits an award of punitive damages.

## SECOND CAUSE OF ACTION

### (WRONGFUL TERMINATION- Against All Defendants)

68.     West incorporates by reference Paragraphs 1 through 67 of this Complaint.

69.     On or about September 29, 2015, Defendants Lehr and Stienes met with West, Grillo, and Wagner in Anaheim, California.  Lehr and Stienes, on behalf of LLR Equity Partners, made a formal presentation to West, Grillo, and Wagner and presented four potential exit scenarios by which LLR Equity Partners might liquidate its investment in ACRE.  The four exit scenarios included a management buyout scenario.  In the presentation and at the meeting, Lehr and Stienes instructed West that one of the "key questions" they needed to answer was whether it was "viable for management to complete an MBO of the ACRE investor base."

70.     Lehr and Stienes reiterated LLR Equity Partners' interest in a potential management buyout offer in early November 2015, immediately before a three-day ACRE board meeting.  On or about November 5, 2015, Stienes distributed the September 2015 presentation outlining LLR Equity Partners' four exit scenarios – including the management buyout offer – to the ACRE Board, including Defendants Grillo, Case and Chefitz.

71.     Absent LLR Equity Partners', Lehr's, and Stienes' representations about the management buyout offer, representations which Defendants Grillo, Case and Chefitz knew Lehr and Stienes had made to West, Grillo and Wagner, West would not have contacted potential lenders about financing the management buyout offer nor would West have submitted the management buyout proposal to the ACRE Board on December 17, 2015.

72.     Having induced West to explore and to submit a management buyout proposal, Defendants nevertheless caused to be issued, on December 17, 2015 a letter entitled "Termination of Employment for Cause," terminating West's positions as Chief Financial Officer and Chief Operating Officer of the Company, and purporting to cancel West's "Incentive Securities." The alleged basis for the termination was "your actively sharing confidential ACRE information and communicating with financial sources" concerning the management buyout proposal. But the confidentiality provisions of West's agreements with ACRE expressly stated that: "Notwithstanding anything contained in this Plan to the contrary, the Participant may disclose Confidential Information (i) as such disclosure or use may be required or appropriate in connection with his or her work as an employee of the Company or its Affiliates." (ACRE Equity Incentive Plan at page 9, paragraph 8.39(c)).

73.     West shared ACRE financial information with certain financial institutions – pursuant to non-disclosure agreements with those institutions – specifically "in connection with his work" as Chief Financial Officer, in the best interests of the Company. West's employment termination was wrongful and in direct violation of the terms of that employment.

74.     As a result of the foregoing, West has suffered damages in an amount to be proven at trial, including compensation and benefits owed under him under California statutory law. Among other things, Defendants have failed to pay wages, bonus compensation, waiting time penalties, 401(k) contributions, accrued vacation due and other amounts under Labor Code ¶¶201, 203 and 227.3. West will also be entitled to his attorney's fees.

75.     Defendants conduct was willful, malicious, and oppressive, and done in conscious disregard of West's rights, subjecting Defendants to an award of punitive damages.

## THIRD CAUSE OF ACTION

### (Conversion - Against Defendant ACRE)

76.     West incorporates by reference Paragraphs 1 through 75 of this Complaint.

77.     At all times pertinent, West owned a total of 16,500 ACRE preferred units and a total of 654.55 ACRE common units.  West had and continues to have a right to possess 654.55 ACRE common units.  Such shares are considered property under California law.

78.     Defendant ACRE wrongfully terminated West "for cause" on December 17, 2015 under the false pretext that West had improperly pursued and presented the management buyout offer to the ACRE Board.

79.     Defendant ACRE has wrongfully and without legal justification purported to take control of 488 common units from West in connection with ACRE's December 17, 2015 termination of his employment.

80.     As a result of this unlawful conversion of his personal property, West has suffered damages in the amount of the value of his canceled ACRE shares in amounts to be proven at trial.   West has also incurred, and will continue to incur, additional damages, costs, and expenses, including attorney's fees, as a result of Defendant's unlawful acts.

81.     Defendant ACRE's conduct in committing the wrongful acts alleged herein was willful, malicious, and oppressive, and done in conscious disregard of West's rights, and therefore merits an award of punitive damages.

## FOURTH CAUSE OF ACTION

### (Declaratory Relief - Against Defendant ACRE)

82.     West incorporates by reference Paragraphs 1 through 81 of this Complaint.

83.     On or about June 3, 2013, in connection with LLR Equity Partners' investment in

ACRE, ACRE and West entered into a Non-Competition Agreement purporting to prohibit West from directly or indirectly "own[ing], operat[ing], manag[ing], control[ing], engag[ing] in, participat[ing] in, invest[ing] in, be[ing] (alone or in association with any Person) or otherwise assist[ing] any Person that engages in or owns, invests in, operates, manages, or controls any business, venture, or enterprise that directly or indirectly engages or proposes to engage in a business in the access control industry . . . anywhere in the World, in any capacity."

84.     Defendants have stated that this Non-Competition Agreement is valid and enforceable against West, although West is a citizen of California, and that West must abide by its terms.  West disputes the validity of the Non-Competition Agreement as unenforceable and contrary to the public policy of California.

85.     An actual and justiciable controversy relating to the legal rights and duties of the parties under the Non-Compete has arisen, specifically as it relates to West's duties and obligations under paragraph 1(a), which provides as follows:

> Subject to Section 1(b) below, in order to protect the value and the goodwill of the Business, for a period of five (5) years from the Effective Date (the "Restricted Period"), West shall not, and shall cause his respective Affiliates and associates (as defined in Rule 405 under the Securities Act of 1933, as amended) (collectively, "WW Affiliates") to, directly or indirectly, (i) own, operate, manage, control, engage in, participate in, invest in, be employed by, permit his name to be used by, act as consultant or advisor to, render services for (alone or in association with any Person) or otherwise assist any Person that engages in or owns, invests in, operates, manages or controls, any business, venture or enterprise that directly or indirectly engages or proposes to engage in a business in the access control industry, including control panels or their components (a "Competitive Business") anywhere in the World, in any capacity, including as a partner, shareholder, member, lender, employee, principal, consultant, agent or trustee, or (ii) intentionally interfere in any material respect with the business relationships (whether formed prior to or after the date of this Agreement) between the Company or its Affiliates and their respective customers, suppliers, licensees, landlords, or other material business relationship of the Company or any of its Affiliates.

86.     A judicial declaration is necessary and appropriate under the circumstances to

determine the parties' rights and duties *vel non* under this agreement.

## PRAYER FOR RELIEF

Wherefore, West prays for the following:

87.    For compensatory in amounts to be proven at trial;

88.    For punitive damages in amounts to be proven at trial;

89.    For a declaration that the Non-Competition Agreement is void and unenforceable;

90.    For costs of suit and attorney's fees; and

91.    For such further or other relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury.

DATED:  August 25, 2017                BUCHANAN INGERSOLL & ROONEY PC

By:    */s/Geoffrey G. Grivner*
       Geoffrey G. Grivner (#4711)
       919 North Market Street, Suite 1500
       Wilmington, Delaware 19801
       Telephone:  302.552.4207
       Facsimile:   302.552.4295
       *geoffrey.grivner@bipc.com*

       Attorneys for Plaintiff William West

OF COUNSEL:
BIRD, MARELLA, BOXER, WOLPERT,
NESSIM, DROOKS, LINCENBERG & RHOW, P.C.
Ekwan E. Rhow
Kimberley M. Miller
1875 Century Park East, 23rd Floor
Los Angeles, CA  90067
(310) 201-2100
Email:  erhow@birdmarella.com
       kmiller@birdmarella.com